THE MORRIS CANAL AND BANKING COMPANY and others, appellants, and SAMUEL F. FISHER, respondent.

1. Coupon bonds, payable to bearer, although not negotiable under the law merchant, as bills and notes, are instruments of *a peculiar character*, and being expressly designed to be passed from hand to hand, and by common usage actually so transferred, are capable of passing by delivery so as to confer a complete title in the possessor.

2. Being negotiable securities usually sold in the stock market, and understood by the parties to be designed for that use, they are the subject of pledge.

3. It is doubted whether a debtor's own obligation has ever been held to be a pledge, or whether a third party's bond or mortgage, deposited by way of collateral or as a pledge, can be sold by the pledger, unless a known usage, or express agreement to do so, is shown.

---

The Chancellor, having been of counsel with the company in reference to the matters in controversy, called to his assistance James Wilson, one of the masters of the court, to advise with upon the hearing of this cause.

The stockholders of the Morris Canal and Banking Company, by resolutions of 10th March, 1846, authorized their directors to mortgage their canal and its appendages, tolls and revenues in order to raise money for certain purposes on bonds of the company, to be secured by the mortgage, which was to be executed to three trustees, to be appointed by the board. The directors, by resolutions of 13th March and 28th March, 1846, appointed John J. Palmer, Zebedee Cook and Theodore Dehon, of New York, trustees for that purpose, and authorized the president and cashier to execute the mortgage to them, and also to issue the bonds. The mortgage was executed accordingly, 28th March, 1846, and duly acknowledged and recorded, and bonds to a large amount were soon after issued. Afterwards, by resolutions of 17th March, 1848, the directors authorized the president

to borrow thirty thousand dollars on the notes of the company, and to deposit with the notes, as collateral security, the company's mortgage bonds to twice the amount of the notes. This loan was for the purpose of raising money to pay interest on the mortgage bonds which had been before issued, and to put the canal in order for navigation that season. The president accordingly borrowed of George F. Lewis, 1st April, 1848, the sum of fifteen hundred dollars and seventy-five cents, and gave him the company's note for that amount at eight months, and deposited with Lewis the company's mortgage bonds to the amount of three thousand dollars.

The note was not paid at maturity, and Lewis, after notice to the company, advertised the bonds for sale, and had them sold at public auction in the city of Philadelphia. The complainant bought them at that sale, and paid the purchase money. The company having refused to pay him the interest on the bonds, and the trustees having declined to take proceedings to compel them to do it, the complainant filed this bill for foreclosure and sale or sequestration of the canal and its income and tolls. The company and the trustees filed separate answers. They admit the execution of the mortgage, and the issuing under it of bonds to a large amount. They also admit that the resolution of 17th March, 1848, was passed by the board, and that the amount of fifteen hundred dollars and seventy-five cents was borrowed by the president of Lewis, and the giving of the note for the loan, and the depositing of the six bonds as collateral security; but they say that the bonds were not issued for any of the purposes authorized by the stockholders, and are therefore not binding on the company, but are void; that if legally issued, yet they were not legally deposited with Lewis as collateral, and he, therefore, had no right to them, and could convey none to the complainant; that Lewis was bound to sue for his debt, and had no right whatever to sell the bonds; that the complainant knew this, and had notice of the character in which Lewis held the bonds; that the sale was not *bona fide*, and that there was collusion between Lewis and the complainant, and that com-

plainant ought to give up the bonds upon the company's paying the amount of the note, which they are ready to do.

The answer of the trustees takes the ground that the complainant could not rightfully file this bill without leave of the court first obtained. But this point was not mentioned in the argument, and is therefore supposed not to be relied on.

*Dayton,* for complainant.

The case made by the bill is sustained by the proofs, and the complainant has, therefore, shown himself entitled to relief according to his prayer. The bonds were issued to raise money to pay interest on the former bonds, and repairs on the canal. These purposes are among those for which the company had authorized the bonds to be issued, as appears by the resolutions and the mortgage.

Defendants say that Lewis had no right to sell the bonds. But that is a question between him and the company. If he held them as mere agent or trustee of the company, and sold them, a *bona fide* purchaser without notice would hold them, and the remedy of the company is against Lewis. *Hart* v. *Ten Eyck,* 2 *Johns. C. R.* 99.

But we say Lewis had a right to sell the bonds after notice to the company. 2 *Kent's Com.* 582.

This is treating the bonds as if they were held by Lewis as a pawn or pledge, though some of the cases go farther, and would give him greater rights than belong to him in that character. But we claim that he held them as a pledge for payment of the note, and that therefore he had a right to sell them on notice to the company. *Story on Bailments,* §§ 308–9–10–11, and case cited in note.

The letters which passed between the president of the company and J. S. Morris & Co., show that the company took the same view. They there admit the right of J. S. Morris & Co. to sell the bonds held by them. Those bonds are, like complainant's bonds, dated at the same time, and issued for a like purpose, and deposited as collateral security for a note of the company

But defendants say that if it is contended that the bonds left with Lewis were meant to secure him for an amount beyond the amount of the note, then the transaction was usurious, and therefore void. But Lewis has not received any more than the principal and interest of his loan. There is, therefore, no usury in the case.

The complainant being the purchaser of the bonds at a public sale, made on due notice to the company, now holds the full and absolute title to them. The defendants cannot follow them into his hands, and have them delivered up on paying the debt for which they were pledged to Lewis. *Little* v. *Barker*, 1 *Hoffman's Ch. R.* 486 ; 2 *Story's Eq.*, §§ 1030–35 ; 4 *Watts* 141–2 ; *Coote on Mortgages* 138 ; 18 *Law Library* 321, *and notes;* 1 *Salk.* 154 ; 2 *Atk.* 53–4.

The purchaser of a bond takes as of course the mortgage given to secure it. Fisher, as the purchaser and present holder of the bond, is therefore entitled to the benefit of the mortgage.

*F. T. Frelinghuysen* and *C. Parker*, for defendants.

The bonds in question in this case were not legally issued, and are therefore not binding on the company. By a resolution of the board, of 28th March, 1846, the mortgage bonds to be issued were not to exceed one hundred and fifty thousand dollars without the further action of the board. It is not pretended that these bonds are any part of that sum ; they are, therefore, without authority.

They were issued for purposes not authorized by the stockholders, nor expressed in the mortgage ; they were issued under the resolution of 17th March, 1848, and for the purposes there mentioned, which were unauthorized. That resolution, and the issuing of the bonds deposited with Lewis, were a fraud upon the rights of the old bond-holders, for it lessened their security under the mortgage. The issuing of the bonds being illegal, the whole transaction is void *ab initio.* Lewis took no title in the bonds, and should convey none to the complainant.

But if legally *issued*, the bonds were not legally *deposited*

with Lewis as collaterals. The directors had no right to deposit them in that way, at the rate of two dollars for one dollar, and borrow. Lewis knew, or ought to have known this, for the mortgage was on record, which showed the purposes for which the bonds were to be issued; and the depositing of them as collaterals was not one of those purposes.

Lewis had no right to sell the bonds; they were not deposited with him as a pledge, but merely as collateral security, which is a distinct thing from a pledge. *Cumber* v. *Hayne*, 2 *Smith's Leading Cases* 146, shows this distinction. He ought, therefore, to have sued on the bonds if necessary to recover his claim, but he could not sell them.

The bonds were not deposited with Lewis as a pledge; for to constitute the compact of pledge there must be a delivery of the pledge; and bonds are choses in action, and do not pass by delivery, but only by assignment in writing. So also of the mortgage. 2 *Hilliard on Mortgages* 343–5. Neither can a man give his own promise to pay money as a pledge for another promise of his own to pay money. It would lead to usury and extortion. It might also, by collusion of parties in buying and selling a pretended pledge, be used to evade the statute relating to confession of judgment; it is, therefore, against the policy of the law to permit it. But even if the bonds were given in pledge, they cannot be sold. The pledgee must not sell them, but sue on them to recover his debt. This is the rule with regard to commercial paper, and it must be the same with bonds. See case of Wheeler *v.* Newbold, decided by Judge Oakley, in the city of New York, lately reported in newspapers, and also in Hunt's Merchants' Magazine.

But even if Lewis had a right to sell the bonds, the complainant stands in no better position than Lewis, the vendor. He must hold them subject to all the equities which existed against them in the hands of Lewis. These bonds are not commercial paper, and do not enjoy the privileges of such paper in passing from hand to hand; they are mere choses in action, which can only pass by assignment in writing, so

as to give the assignee a right to sue in his own name.    The complainant being merely the assignee of Lewis, all equities which existed against the bonds in Lewis' hands still exist against them.    *Clute* v. *Robinson*, 2 *J. C. R.* 595, 612; *Norton* v. *Rose*, 2 *Wash. Rep.* 248.

Lewis would have been bound to deliver up the bonds on payment of the amount due on the note, and the complainant must do the same.

The complainant's counsel makes a distinction in favor of these bonds, because they are payable to bearer; but we deny that they are commercial paper.    We deny that any title is given to them by delivery.    *Clark* v. *Woolen Manufacturing Co.*, 15 *Wend.* 256.

The legal title to bonds, as distinguished from the equitable, cannot pass by delivery.    *Barry* v. *Merchants' Exchange Co.*, 1 *Sanford's R.* 313.

But even if suit might be brought on these bonds in name of the bearer, still they are subject to the equities existing against the assignor, for they are still *bonds*, and not commercial paper.    Sound policy requires that the privileges enjoyed by commercial paper, of passing by delivery, should be restrained to that class of paper.    *Baldwin* v. *Ely*, 9 *Howard's Rep.*

The complainant must, therefore, be considered as standing in Lewis' shoes; and if Lewis were the plaintiff here, he could recover no more than his debt, interest and costs. *Hartshorne* v. *Allaire*, 1 *Zab.* 671.

The letters which passed between J. P. Morris & Company and the president are not admissible.    But if they are, then the letter from the president to George Bird is also admissible for defendants; and he there denies the right of Bird to sell the bonds, which counterbalances any supposed admissions in his letter to Lewis.

The construction of this transaction, by which these bonds were deposited with Lewis, ought to be governed by the intention of the parties; and it was never the intention of the company that Lewis should have three thousand dollars for fifteen hundred dollars borrowed of him

Since the sale, Lewis has recovered in our Supreme Court a judgment against the company for a difference between the sum for which the bonds were sold and the amount of the note.

To allow the complainant to recover the amount of the bonds, is to compel the company to pay more than twice the sum they borrowed. This would be unjust, and a court of equity ought to prevent it.

The complainant ought to have charged in his bill that he bought the bonds without notice of the character in which Lewis held them. A defendant to a bill of disusury, who claims to be a purchaser without notice, must state want of notice. *Story's Eq. Pl.*, § 805.

The rule is the same in regard to a complainant. Complainant may amend his bill in regard to new matters stated in the answer. We have in our answer charged him with notice, and he ought now to amend his bill and allege want of notice. *Story's Eq. Pl.*, § 918, 884–5.

But even if complainant has any title to the bonds, he has none to the mortgage, or any part of it. A mortgage is a chose in action, and cannot pass by delivery, but only by assignment in writing.

*Dayton*, in reply.

The issuing of the bonds in question here, and the depositing of them as security, was done by the directors and officers; they had authority for it, and they reported their proceedings to the stockholders. It was not a fraud.

The question pending in this case does not affect the old bond-holders—their security is not in any way lessened.

It is said that the bonds in the hands of the complainant are subject to all the equities which existed against the original obligees. But the three trustees are the obligees, and they are the company's own agents ; the company can, therefore, have no equities against them.

These bonds are negotiable on their face, being payable to Palmer or bearer. It was the intention of the company

to make them negotiable. Bonds of this sort have been issued by many different companies, and they have been uniformly treated as negotiable. A contrary doctrine would not be tolerated. Whether a security is negotiable or not, does not depend on whether it is commercial paper; but, if payable to bearer, it will pass by delivery. As to the distinction between negotiable and assignable paper, see *Miller* v. *Race*, 1 *Smith's Leading Cases* 258, and notes. Defendants say that there is no such thing as a sale of a chose in action which has been deposited as collateral. We answer that, however that may be, it does not affect the complainant, for he bought without notice that it had been deposited as collateral.

But *Story on Bail.*, §§ 322–3, speaks of negotiable security as among the things sold. *Cortleyou* v. *Lansing*, 2 *Caines' Cas.* 200, shows that a negotiable security may be sold, though that is not the point of the case.

*Garlick* v. *James*, 12 *Johns.* 146, treats a promissory note as a thing which may be pledged and sold.

*Tucker* v. *Wilson*, 1 *P. Wms.* 261, shows that an annuity, which is a chose in action, may be given in pledge and sold.

*Evans* v. *Darlington*, 5 *Blackford's Rep.* 320, maintains that a negotiable security may be pledged and sold. This case turns on the fact that the sale which had been made was *without notice*.

In the case of Wheeler *v.* Newbold, cited from the newspapers, Judge Oakley, who decided it, does not cite a single authority in support of his opinion; and he suspended the entry of judgment upon his decision until the point could be argued before a full bench at the general term. Besides this, the counsel who argued before him against the validity of the sale of the commercial paper which had been pledged, took no objection to it, except only that the sale had been a private one, while they insisted that it should have been a public sale. In addition to this, it must be remarked that newspaper reports of law cases are often so imperfect and inaccurate as to be unreliable.

Complainant is not bound to allege in this bill that he

bought the bonds without notice. How could he allege want of notice of facts which may have just been made known to him by the defendants' answer? If the defendants wished to put the complainant on oath upon that point they could have done so by exhibiting interrogatories to him.

Defendants say that complainant is not entitled to benefit of the mortgage. But he bought the bonds and the mortgage. Security, *pro tanto*, follows as an incident. But even if he is not entitled to the security of the mortgage, he is still entitled to a decree for the amount of the bonds under the general prayer for relief.

THE MASTER. The complainant in this cause is the holder, and claims to be the owner, by a full and absolute title, of six bonds of the Morris Canal and Banking Company, purchased by him at public sale for a valuable consideration. They are dated 31st March, 1848, and are for the payment of the sum of five hundred dollars each, payable on 1st April, 1850, to John J. Palmer, or bearer, with interest payable half-yearly, and having coupons for the interest annexed. In the body of each bond it is stated as follows : " The holder of this bond is entitled to the security to be derived from a first mortgage on the estate and chartered rights of the company, dated 28th March, 1846, authorized by the board of directors, at a meeting held on the 10th day of March, in the year last aforesaid, and duly recorded, executed and delivered to John J. Palmer, Zebedee M. Cook and Theodore Dehon, of the city of New York, as trustees, in trust to secure the full payment of such bonds as should be issued under the same; each bond, to clearly identify the same, bearing the signature of the trustees; the whole amount of bonds to be issued not to exceed the sum of seven hundred thousand dollars."

Upon the margin of each bond is a certificate, signed by these three trustees, whereby they certify that the bond is included in the mortgage upon the canal, which had been executed to them in trust for the bond-holders.

Before the filing of this bill, the complainant applied to the company to pay him the interest which had become due

upon these six bonds held by him, which they refused to do. He then applied to the trustees to take the proper measures to compel the company to pay him the interest; but the trustees declined to do so. He then filed this bill for the foreclosure of the equity of redemption in the mortgaged property, praying a sale of the canal and its appendages, or a sequestration of its tolls and revenues, in order to satisfy his claim. The mortgage is in proper form, and is executed under the seal of the company, and appears to be a valid lien upon the property described in it for the benefit of the holders of the bonds which it was intended to secure.

If, then, the bonds held by the complainant are valid bonds of the company, and are entitled to the benefit of the security of the mortgage, and if the complainant is the owner of the bonds by a complete and absolute title, he is entitled to the relief which he seeks.

The defendants insist that the bonds were not issued for any of the purposes authorized by the stockholders and directors, and that, therefore, the bonds are not binding upon the company, but are fraudulent and void. The resolution of the stockholders, authorizing the execution of the mortgage, and the bonds to be secured by it, was passed 10th March, 1846, and the resolutions of the board of directors, directing the president and cashier to execute and deliver the bonds, were passed 28th March, 1846. The form of the mortgage, which was afterwards executed, was fixed by these resolutions of the board, and is therein recited at length, and the purposes for which the bonds to be secured by it were to be issued are set forth in the mortgage. The mortgage recites that the company, "for the purpose of raising money to pay off the debts incurred in improving, enlarging and repairing their canal, and of raising money to be expended in further improving and perfecting the same, are about to make, execute and issue certain bonds for sums not to exceed in the whole seven hundred thousand dollars." And further, that with a view to enable the said company "to raise the said moneys, and thereby secure the continued progress and operation of their said canal, and

obtain further time finally to discharge the expenses of the improvements already made, the said company, by their board of directors, have resolved to secure the payment of said moneys by the pledge and hypothecation of their said canal, with its appurtenances, and the actual revenues, chartered rights, and properties of the said company," &c.

By the resolutions passed at the same meeting of the board, the president and cashier were authorized and directed to execute and delivered the said bonds mentioned in the mortgage. But it was provided that the amount of the bonds to be issued should not exceed the sum of four hundred and fifty thousand dollars, without the further action of the board. One of these resolutions also fixed the salary of the three trustees, for the service to be rendered by them, at one-half of one per cent., each, on the amount of the bonds to be issued, and directed that a sufficient amount of the bonds to pay the salary should be retained in the hands of the loan committee, to be paid to the trustees at a time fixed by previous resolutions.

This shows the authority under which the bonds were to be executed by the president and cashier, and the purposes for which they were to be issued and used. It also shows that the trustees were appointed by the company, and were to be paid by the company for their services. Soon after these resolutions were passed, bonds were, in pursuance of this authority, executed and issued to a large amount.

Afterwards, on the 17th March, 1848, the company were in need of money to pay the interest on those bonds and to put the canal in order for navigation for the season then approaching, and the board of directors, at a meeting held on that day, adopted a resolution, by which it is declared that the president is authorized to borrow thirty thousand dollars to pay the "interest coming due on the 1st of April, and the expense of putting the canal in order for navigation for the present year; and to give the company's notes, at such time as he may deem consistent with the interest of the company, and deposit with said company's notes, the

company's mortgage bonds for twice the amount of the notes."

Under this last resolution, the president of the company, on the 1st of April, 1848, borrowed of George F. Lewis, of Philadelphia, the sum of fifteen hundred dollars and seventy-five cents, and gave him the company's note, bearing date on that day, for that sum, and at the same time deposited with him, as collateral security, six of the company's mortgage bonds, of five hundred dollars, each. The note is made payable to the company's own order eight months after date, is signed by the president, and endorsed by the cashier, and there is a certificate across the face of the note not signed, but proved to be in the handwriting of the secretary of the company, which states that the said six bonds were deposited with the note as collateral security. These are the bonds in controversy in this suit. I think that the defendants' objection that these bonds were not issued for any of the purposes authorized by the stock-holders or mentioned in the mortgage, and are therefore void, is not well taken. The money borrowed of Lewis was to pay interest on the mortgage bonds which had been before issued, and which it is not denied were properly issued, and also for the purpose of putting the canal in order for the season then approaching. These purposes for which this money was borrowed are, in my opinion, clearly included within those for which money was to be raised on the mortgage, and the bonds to be issued under it, as expressed in the mortgage itself. It is there recited that the bonds to be secured by the mortgage were to be issued for the purpose of raising money to pay off "the debt incurred in improving, enlarging, and repairing the canal, and of raising money to be expended in further improving and perfecting the same."

Now the bonds which had been issued, and on which the interest was coming due, were issued to raise money for the purposes just mentioned. To borrow money to pay that interest, and to give as security for that loan other bonds also secured by the mortgage, was surely no departure from

the design and purpose with which the mortgage was given. It did not increase the debt under it, nor was the money raised by the loan perverted to unauthorized purposes, but was still applied to pay the debt secured by the mortgage. The interest on the debt was a part of the debt itself, and, as to so much of the loan as was to be applied to putting the canal in order for navigation for that season, it was plainly within the authority "to raise money to be expended in further improving and perfecting the same," as expressed in the resolutions of the stockholders and in the mortgage.

It is objected further by the defendants, that even if it be admitted that the money raised by this loan from Lewis was for purposes mentioned in the mortgage, yet that the directors and officers of the company had no authority to deposit the bonds as collateral security, at the rate of two dollars for one dollar borrowed; and that, in so doing, they transcended their powers, and moreover committed a *fraud upon the other bond-holders*, by lessening their mortgage security, and that therefore the bonds in question in this suit are not binding upon the company, but are void, and that this court ought to protect the other bond-holders against such fraud. The objection is not that the bonds were not properly *executed*, nor that the money raised on them was raised or used for an improper or unauthorized purpose, for the bonds were executed by the officers of the company, in whom full authority for that purpose was vested; and it is admitted, for the purposes of this argument upon this point, that the money raised on them was for purposes mentioned in the mortgage and authorized by the stockholders. The objection, therefore, goes only to the *mode* and *manner* in which the directors and officers of the company disposed of the bonds in raising money for purposes for which they were authorized to raise it upon those bonds. The stockholders, in authorizing those bonds to be executed and delivered, and money to be raised upon them for the purposes mentioned, did not prescribe the manner in which it should be done. They left the bonds in

the hands of their directors and officers without any restrictions or directions upon that point, having, no doubt, full confidence that they would, according to their best judgment, so use them for the end proposed as would most advance the interests of the company ; and I think it must be considered that it was the intention of the stockholders to leave the matter to the discretion of the directors and officers.

But further on this point. The officers of a bank are held out to the public as having authority to act according to the general usage, practice and course of business of such institutions, and their acts within the scope of such usage, practice and course of business will bind the bank in favor of third persons having no knowledge to the contrary. The cashier of a bank is usually intrusted with all the funds of the bank in cash, notes, bills and other choses in action, to be used from time to time for the ordinary and extraordinary exigencies of the bank. He is considered as the executive officer of the bank, *through whom* and by whom the money transactions of the bank, in paying or receiving debts and discharging or transferring securities, are to be conducted. *Story on Agency*, § 114; *Fleckner* v. *U. S. Bank*, 8 *Wheaton's R.* 338.

Now the stockholders had authorized the execution of these bonds, and the borrowing of the money upon them, and left them in the hands of the officers of the company, with no restrictions upon them as to the mode of their using the bonds for that purpose.

Then in borrowing money, and giving those bonds as security for it, they had authority to use them, according to the course of business in such transactions. They had a right to deposit them as collateral ; for that mode of using bonds and other such securities is within the usual course and usage of business, both of incorporated companies and individuals. And if it had been done by the cashier alone, it would, by the law of agency, as laid down in the authority just cited, have been binding on the company.

But it was not done by him alone. It was authorized by

Morris Canal and Bank. Co. v. Fisher.

an express and formal resolution of the board of directors, under which the note was given, and the bonds deposited as collateral security for its payment; the note was signed by the president and endorsed by the cashier; the secretary of the company certified, upon the face of the note, that the bonds were deposited as collateral security for it, and the three trustees, who in this were acting as the agents of the company, certified that the holder of the bonds was entitled to the security of the mortgage. The directors and all the officers of the company, therefore, appear to have participated in this transaction; and if it were now held that it is not binding upon the company, but is fraudulent and void, there would be no safety in dealing with the officers of a corporation.

But it was insisted, on the argument, that even if they had the right to deposit the bonds as collateral security for the loan, yet that they had no right to do it at the rate of two dollars for one dollar borrowed. I think that that was a matter fairly within their discretion. The amount of a collateral is usually greater than the debt which it is intended to secure; how much greater it shall be must depend upon the circumstances of each particular case. By the annual report of the directors to the stockholders, dated 17th March, 1848, a printed copy of which is in evidence, it appears that the credit of the company had become so much depressed that its mortgage bonds could not be negotiated at par. That may have been the reason why they deposited them at the rate of two dollars for one dollar, as collateral security for the money borrowed of Lewis, which was obtained two weeks after the date of that report; and if so, it can hardly be said that such security was so extravagant and unreasonable as to amount to a fraud and a breach of authority on the part of the persons making it. But it is not necessary to examine into their reasons; it is enough that that matter was in the discretion of the directors and officers, and that there is no evidence that they abused their trust.

In addition to what I have already said on this part of

VOL. 1. 2 U

the case, there is much reason to believe that this mode of using the company's bonds was sanctioned by the stockholders. Copies of some of the annual reports made by the board of directors to the stockholders are in evidence in the case. In the report dated 17th March, 1848, page 25, it is stated that it "became necessary, to enable the company to meet pressing demands, again to negotiate further loans, for which it gave its note to the amount of seventy-seven thousand eight hundred and six dollars and fifty cents, to secure the payment of which there was deposited with those notes, one hundred and fifty-five thousand six hundred and fifty dollars six per cent. mortgage bonds as collateral."

And in the report dated 2d April, 1849, page six, it is stated as follows: "About the first of April last there was borrowed the sum of fifteen thousand three hundred and twenty-three dollars and . fifty-nine cents on the company's notes, at six and eight months, with which were deposited, as collateral security, the mortgage bonds of the company for twice the amount of the notes." The time of this first-mentioned loan (the first of April, 1848,) is the date of the note given to Lewis, and for which the six bonds in controversy here were deposited as collateral security, and it is a note at eight months. It is not unreasonable to conclude, therefore, that the loan from him was a part of the sum of fifteen thousand three hundred and twenty-three dollars and fifty-nine cents mentioned in the report, and secured in the manner there stated.

This mode of using the company's mortgage bonds as collateral security to notes given for loans, and to twice the amount of the notes, appears, therefore, to have been resorted to at different times, and to have been regularly reported by the directors to the stockholders, and the making of the loans of which the money obtained from Lewis was probably a part, and which was secured in the same way, was also reported to them. There is no evidence that the stockholders ever objected to that mode of using the bonds, or laid any restraint upon it; and I think it must be considered to have received their silent acquiescence, if not their express ap-

probation. So far as the *company* is concerned, therefore, this objection must fail. Nor do I think it can prevail for the *bond-holders*, for they took their bonds knowing that the mortgage by which they were to be secured was intended to cover bonds to an amount not exceeding seven hundred thousand dollars. If the bonds issued to raise money for the purposes mentioned in the mortgage do not exceed that amount, they cannot complain that their security is lessened. The money raised on the bonds held by the complainant was for such purposes; and there is no evidence that the bonds which have been issued, including the bonds of the complainant, amount to the sum of seven hundred thousand dollars, nor is there any evidence that the property covered by the mortgage is not sufficient to pay them all.

I consider, therefore, that the bonds in question in this suit were legally and properly issued under the authority given by the stockholders, and that the depositing of them with Lewis, as collateral security for the loan obtained from him, was and is binding upon the company, and is not a fraud upon the other bond-holders.

The company's note, given to Lewis for the loan, was not paid at maturity, and he thereupon, on 12th December, 1848, gave notice to the president of the company that the six bonds held by him as collateral security to the note would be sold at public sale on the 19th of that month, at seven o'clock, P. M., at the Philadelphia Exchange, by M. Thomas & Sons, auctioneers, and that the company would be held accountable for the deficiency, if any, between the proceeds of the sale and the amount of the note. The president acknowledged the receipt of this notice, in a letter to Lewis, and at the same time stated to him that the bonds were not left to be used in the way he proposed; that, being deposited as collateral, they could only be used upon the inability of the company to pay the note, and that that inability was not established by the note not being paid at maturity; that the company protested against the proposed sale, and that Lewis would be held responsible to the company for the full amount of the bonds in case such sale should be made. The sale,

however, was proceeded with. It had been advertised in pamphlets, and in at least four daily papers in the city of Philadelphia, and at the time and place mentioned in the advertisements, and in the notice sent to the president of the company, the bonds were sold at public sale, by the auctioneers before named, to the complainant.

It does not appear that Lewis was present at the sale, nor did it appear by the advertisements, or in any other way to the persons attending it, that he had any interest in the bonds, or was in any way connected with the sale. The bonds were merely advertised to be sold " without reserve, for account of whom it may concern."

On the part of the complainant, it is insisted that the bonds were deposited with Lewis, as a pawn or pledge for the payment of the note at maturity, and on the note not being so paid, he had a right to sell them at public sale, on due notice to the company ; and that, by the sale, the title to the bonds passed to the complainant, and that he is entitled to the amount of them, and to the benefit of the security of the mortgage.

The defendants, on the other hand, say that the bonds were not deposited as a pawn or pledge, but as a collateral security, and that that is a distinct and different thing from a pledge; that a man is not permitted to give his own promise to pay money as a pledge for another promise of his own to pay money, since it would lead to usury and extortion, and might, by collusion of parties, be used to evade the statute relating to confession of judgments ; that bonds cannot, from their very nature, be given in pledge, because it is essential to the making of a pledge that there be a delivery of it, and bonds, it is insisted, cannot pass by delivery, but only by assignment in writing; that Lewis was bound first to sue on the note, and, if he failed to recover his debt in that way, then to sue on the bonds, and not to sell them ; that, for these reasons, Lewis had no right to sell the bonds at all, and that the sale passed no title or interest in them to the complainant.

I do not think that the position of the defendants, that a

bond deposited as collateral security is a distinct and different thing from a pawn or pledge, can be maintained. I find no authority for that distinction ; on the contrary, the reported cases show that notes, bonds, and other things deposited as collateral security, have been frequently regarded as pawns or pledges. *Vanderzee* v. *Willis*, 3 *Bro. C. R.* 21 ; *Garlick* v. *James*, 12 *Johns.* 146.

Nor do I see the soundness of the objection, that a man is not to be permitted to give as a pledge his promise to pay money as security for another promise of his own to pay money, on the ground that it would lead to usury and extortion, and an evasion of the statute relating to confession of judgments. How does it lead to usury ? The lender of the money would not and could not get more than his loan and interest. In the present case Lewis does not and cannot get more than his debt and interest. I do not see in such a transaction any temptation to parties to resort to it with the hope of obtaining usurious interest or of extorting money from the necessities of others ; neither do I perceive how it could be used to evade the statute relating to confession of judgments without a resort to fraud and collusion. If these were practiced, they would make the transaction void. And the same thing may be said of many other proceedings which are in themselves honest and lawful. There is no pretence of any fraud or collusion on the part of any of the parties to the transaction now under consideration, and it would never do to lay it down as a rule that an act done with fair and honest purposes shall be void because other parties might do a like act, with a fraudulent intent to evade the laws.

The defendants are not correct in saying that bonds cannot pass by delivery, but only by assignment in writing. Bonds may pass by delivery, and without written assignment.

The delivery of a bond for a valuable consideration is a good assignment of it without writing, and passes the bond, and the debt due upon it, to the assignee. *Hutchings* v.

*Low*, 1 *Green* 246, and *Allen* v. *Pancoast, Spencer's Rep.* 68, and the cases there cited.

Are *bonds*, then, a species of personal property which may be pledged? Story, in speaking of the things which may be the subject of a pledge, says: "These are ordinarily goods and chattels, but money, debts, negotiable instruments, choses in action, and, indeed, any other valuable thing of a personal nature, such as patent rights and manuscripts, may, by the common law, be delivered in pledge." *Story on Bail.*, § 290. And his text appears to be fully sustained by the authorities which he cites.

Kent also says, " All kinds of personal property that are vested and tangible, and also negotiable paper, may be the subject of a pledge ; and choses in action resting on written contract, may be assigned in pledge." 2 *Kent's Com.* 577. Among the things here mentioned as the subject of pledge, bonds are certainly included.

In *Vanderzee* v. *Willis*, 3 *Bro. C. R.* 21, bonds were, with other things, pledged for the security of a promissory note ; and no doubt seems to have been entertained by any of the counsel who argued the case, nor by the Lord Chancellor who decided it, that they could be so pledged.

In *Hart* v. *Ten Eyck*, 2 *Johns. C. R.* 100, and in 2 *Kent's Com.* 582, bonds are mentioned as among those things for which bills to redeem were frequently filed in chancery.

That bonds may be given in pledge, therefore, is a doctrine which seems to be well sustained by authority.

The bonds in question, in this case, were delivered by the company, through its officers, to Lewis, as security for the payment, at maturity, of the note given to him for the loan, and he had a right to keep them until that debt was discharged.

This was, I think, plainly the intention of the parties to that transaction ; and I am therefore of opinion that the bonds were delivered to him as a pledge. A pledge is a bailment of personal property as security for some debt or engagement. *Story on Bail.*, § 286. It is also defined by Kent to be a bailment or delivery of goods by a debtor to

his creditor, to be kept until the debt be discharged. 2 *Kent's Com.* 577. See, also, *Garlick* v. *James*, 12 *Johns. Rep.* 146 ; *Cortleyou* v. *Lansing*, 2 *Caines' Ca.* 200. The deposit of these bonds with Lewis comes strictly within the definition of a pledge, as laid down by these and other authorities.

The note was not paid at maturity ; the company, therefore, failed to perform the engagement for which the bonds had been pledged. The defendants have argued that Lewis, in order to recover his debt, was bound to sue first on the note ; but I find no authority for that position. He had his election to do so or to resort to his remedy upon the bonds, by having them sold under a decree of foreclosure or by selling them himself on due notice to the company.

Story, on this subject, says: " Another right resulting by the common law from the contract of pledge, is the right to sell the pledge when there has been a default in the pledger in complying with his engagement. Such a right does not divest the general property of the pawner, but still leaves in him a right of redemption. But if the pledge is not redeemed within the stipulated time, by a due performance of the contract for which it is security, the pawnee has then a right to require a sale to be made thereof, in order to have his debt or indemnity. The common law of England existing in the time of Glanville seems to have required a judicial process to justify the sale, or at least to destroy the right of redemption. But the law, as at present established, leaves an election to the pawnee. He may file a bill in equity against the pawner for a foreclosure and sale, or he may proceed to sell *ex mero motu* upon giving due notice of his intention to the pledger. In the latter case, if the sale is *bona fide* and reasonably made, it will be equally as obligatory as in the first case." *Story on Bail.*, §§ 309, 310.

The same doctrine is laid down in 2 *Kent's Com.* 582, and in *Parker* v. *Brancker*, 22 *Pick.* 40. But the defendants have argued that although this is the general rule in regard to property given in pledge, yet that bonds form an exception to it. I do not, however, find any authority or any well-

considered case which sustains such exception, or which shows that bonds given in pledge are not subject to the same rules as other property which has been pledged. The weight of the authorities and the whole current of decisions are directly the other way.

In 4 *Kent's Com.* 139, it is said, " the pawnee, by bill in chancery, may bar the debtor's right of redemption, and have the chattels sold. This has frequently been done in the case of stock, *bonds*, plate, or other personal property pledged for the payment of debts. But without any bill to redeem, the creditor, on a pledge or mortgage of chattels, may sell at auction, on giving reasonable opportunity to the debtor to redeem, and apprising him of the time and place of sale, and this is the more convenient and usual practice." So that the right of the pledger to sell *bonds* is here expressly maintained. And why, it may be asked, should such bonds as are in question here be an exception to the general rule ? They are, as has been stated, made payable to bearer, with coupons for interest annexed. Bonds of this description are, in point of fact, often sold, and the market or current price of some classes of them is frequently advertised and quoted. To sell them, is therefore not an extraordinary proceeding, but one usual among individuals in their private transactions.

I consider, therefore, that Lewis had a right, on the failure of the company to pay the note at maturity, to proceed to sell the bonds in one of the two modes already mentioned. He chose to sell on his own authority without judicial process, and that is said by Kent to be " the more convenient and usual practice."

Certain letters, which passed between the president of the company and J. P. Morris & Co., of Philadelphia, were offered in evidence by the complainant, in order to show that the company had admitted that J. P. Morris & Co., with whom the company's mortgage bonds had been deposited as security for a note, had the right to sell them on the failure of the company to pay the note. The defendants objected to this evidence as inadmissible, but offered, on

their part, in case it should be admitted, another letter from the president of the company to George Bird, with whom like bonds had, under like circumstances, been deposited as security, and who proposed to sell them, in which the company protested against his right to do so. These letters were all read at the hearing, subject to the exceptions taken. I am in doubt as to the admissibility of this evidence, and I do not consider it necessary to examine or decide the question; for, in the conclusion I have come to, I have not given any weight to these letters either way. In my view of the case, Lewis had, by force of the rules of law relating to pledges, a right to sell the bonds in the manner before stated, and that right is not in any wise affected by any admissions or protests on the part of the company.

When Lewis proceeded to sell, he gave notice to the company of the time and place of the intended sale. The notice seems to have been a proper one, and no objection has been made to its reasonableness or sufficiency. The sale was advertised in a full and ample manner; it was made by established auctioneers, at a public place, and seems to have been fairly and openly conducted. It is charged in the answers of the company, that in buying the bonds, the complainant acted in collusion with Lewis, who, it is charged, was to have an interest in the purchase; but there is no evidence whatever to sustain this allegation. The complainant appears to have acted fairly in the matter, and to have purchased on his own account, without any connection with Lewis, or any knowledge that he had any right or interest in the bonds. The complainant is therefore to be considered as the *bona fide* purchaser of the bonds for a valuable consideration, at a public sale fairly made and authorized by law, and whereof due notice had been given to the company.

It is further insisted by the defendants, that even if Lewis had a right to sell the bonds in the way he did, and even if the complainant bought them *bona fide*, yet that he cannot hold them with any other or higher right or title than Lewis had in them; that he must stand in Lewis' shoes, and

take the bonds subject to all equities existing against them in the hands of Lewis; and various authorities were cited on the argument in order to show that where bonds have been assigned, the assignee takes them subject to all equities which existed against them in the hands of the obligee or assignor.

And it is argued that the same rules must apply to these bonds in the hands of the complainant ; that Lewis held them only as collaterals, and subject to be delivered up on payment of the principal and interest due on the note ; and it is argued that the complainant is merely his assignee, and must hold them subject to the same claim, and must deliver them up on payment by the company of the amount of the note.

By the delivery of the bonds to Lewis, in pledge for the payment of the note, he acquired only a *special* property in them, the *general* property remaining in the company. *Story on Bail.*, § 287 ; *Cortleyou* v. *Lansing*, 2 *Caines' Ca.* 202.

And the effect of the default in the payment of the note at maturity was not to vest the entire property in the bonds in Lewis, but to give him a power to sell them, he accounting to the company for the surplus remaining, if any, after paying the note. *Story on Bail.*, § 308 ; *Coggs* v. *Barnard*, 1 *Smith's Leading Ca.* 99, and notes. So that at the time of the sale by Lewis, there was in him only a special property in the bonds, the general property in them still remaining in the company.

Now I consider that the sale of the bonds at public auction to the complainant did not operate simply as a transfer to him of the right which Lewis had in them at that time. It was not merely an assignment by Lewis of his right in them to the complainant ; it was much more. It was a sale of the whole interest in the bonds, and conveyed the whole property and title in them to the complainant. If this were not so, and if the sale operated merely as a transfer or assignment to the complainant of the special property which Lewis had in them, there would be no need

of a sale at all, for the same thing might be much more easily accomplished by a more private assignment in the ordinary way. The sale made by Lewis, of his own authority, without application to any court, was, as it is laid down by the authorities already cited, equally as obligatory as if it had been made under the authority of a decree of foreclosure. Now if the complainant had bought these bonds at a sale made under such decree, it would not be pretended that the company would have the right to follow them into his hands, and have them given up on paying the debt for which they had been pledged. How, then, can they follow them now? This case, being in my view very different from that of a mere ordinary assignment of bonds in the way usual in private transactions, and the complainant standing not as the assignee of Lewis' right, but as the purchaser of the whole title and property in the bonds, I do not consider that the cases which have been cited to show the rules of law respecting the rights of parties upon an assignment of bonds as applicable here. The defendants' objection under this head is in effect the same as saying that the right which the company had to redeem the bonds while they were in the hands of Lewis, upon paying the amount of the note, still exists after the sale, and that they have the same right against them now in the hands of the complainant. But this is manifestly unreasonable, and opposed to the very idea of a sale of the bonds. Where is the necessity or propriety of a sale, if such is the case? What is the inducement to any person to become a purchaser, if he must at any time give up the bonds on these terms? And where does this alleged right end? Does it follow the bonds into the hands of the purchaser, and, if he assign them, does it go with them into the hands of his assignee, and so on without end? All the authorities which I have examined speak of the right to redeem the pledge as existing until the sale, and they plainly consider it as existing no longer, whether the sale be made under the decree of foreclosure or by the pledgee of his own authority with-

out any previous application to the courts.   *Story on Bail.*, §§ 309, 310; 4 *Kent's Com.* 139.

Under this view of the case, it is of no consequence whether the complainant had notice or not that the bonds had been deposited with Lewis as a pledge; for if the pledgee had a right to sell the pledge absolutely, the knowledge of the right and authority by which he does it cannot destroy nor affect the title of the purchaser.

The defendants insisted that the complainant ought to have charged in his bill that he bought without notice.   But I do not think so; the case made by the bill is complete without it.   If he had notice, and the defendants thought that his rights were thereby affected, it was competent for them to prove it; but I do not think that it was necessary for the complainant to aver want of notice in this bill.

But there is another view of this case, which, in my opinion, forbids that any right to redeem, or any other equitable claim which the company may have had upon these bonds, should follow them into the hands of the complainant.   These bonds must, I think, be regarded as negotiable securities, and capable of passing by delivery, in the same way as a promissory note payable to bearer or a bill of exchange endorsed in blank.

The bonds are payable to John J. Palmer, or bearer, with coupons annexed for interest payable half-yearly.   Bonds of this description were unknown to the ancient common law; they are of comparatively modern origin.   They have been issued in this country in very large amounts, and have entered extensively into the business operations of the community.   And by the corporations which have issued them, and among all persons who in the course of business have had occasion to receive them or to pass them to others, or to deal with them in any way, they have always been considered and treated as securities which pass from hand to hand by delivery.   This was asserted upon the argument, and not denied, and cannot, I think, be controverted.   The usage in regard to them must have been understood by the company when they issued these bonds.   By the terms of

them, they are payable to the bearer; and it was, no doubt, the intention of the company, in making and issuing them, that the bearer, whoever he might be, should be entitled to the amount. I think, therefore, that to hold these bonds to be negotiable, is to construe them according to the intention of the maker, and the general usage in regard to securities of this description.

The case of *Gorgier* v. *Mieville et al.*, 3 *Barn. & Cress.* 45, was the case of a bond of the king of Prussia, in which he declared himself and his successors bound to every person, for the time being holder of the bond, for the payment of the principal and interest. The plaintiff had deposited the bond in the hands of Agassig & Co., to hold for his benefit, and receive the interest upon it. Agassig & Co., being in want of money, pledged the bond to the defendants, and this was an action of trover to recover the bond.

It was proved, at the trial, that bonds of this description were sold in the market, and passed from hand to hand daily, like exchange bills, at a reasonable price, according to the state of the market. The opinion of the court was against the plaintiff, and under its direction the jury found a verdict for the defendants. On a rule *nisi* for a new trial, the case was fully argued, and it was decided by the court that the rule must be discharged, and judgment entered for the defendants. In delivering the opinion, Abbott, Chief Justice, said : " This instrument, in its form, is an acknowledgment, by the king of Prussia, that the sum mentioned in the bond is due to every person who shall for the time being be the holder of it, and the principal and interest is payable in a certain mode and at certain periods mentioned in the bond. It is, therefore, in its nature precisely analogous to a bank note payable to bearer or to a bill of exchange endorsed in blank. Being an instrument, therefore, of the same description, it must be subject to the same rule of law, that whosoever is the holder of it has the power to give title to any person honestly acquiring it."

The case of *Clark* v. *Farmers' Manufacturing Co.*, 15 *Wend.* 256, was cited by the defendant's counsel as holding

a contrary doctrine. But I do not so understand it. It was an action on a sealed bill of the defendants in that case, which was declared on as a promissory note. Chief Justice Nelson delivered the opinion of the court, and held that it could not be so declared on, and that it was not a negotiable instrument. In referring to the case of Gorgier v. Mieville et al., he spoke of the decision there as resting upon usage and the nature of the security. And though he does not assent to all the reasonings of the case, he does not deny nor seem to doubt that the decision was right, and was rightly placed upon that ground. The case of Gorgier v. Mieville was fully argued and deliberately considered, and its reasonings and conclusions appear to me to be sound and just. I think that the rule there laid down is applicable to the present case, and that the bonds in question must be considered negotiable. To hold a contrary doctrine, and to make such bonds, in the transfer from one person to another, subject to all the rules which apply to ordinary bonds would be contrary to the intention and terms of the instruments, and the usage in relation to them, and might unsettle many most important transactions and produce great mischief and confusion.

Holding these bonds of the complainants, therefore, to be negotiable, they are, under the authorities already cited, the subject of pledge, and having been pledged, and the pledgee having lawfully sold them, that sale is binding upon all parties, and conveys a perfect title to the purchaser. *Story on Bail.*, §§ 290, 300.

The defendants, however, have insisted that they were not pledged to Lewis, and therefore he had no right to sell them. But the holder of negotiable paper, even though he be not the owner, may sell or transfer it to another person, who, if he takes it without notice of the fraud, acquires a good title against the owner. The complainant, as has been already shown, bought these bonds without notice of the character in which Lewis held them, and the transaction is therefore binding upon the company, and the complainant has a good title against them. This depends on well-settled

principles of law. *Story on Bail.*, § 296 ; *Grant* v. *Vaughn*, 3 *Burr.* 1516 ; *Bay* v. *Coddington*, 5 *Johns. C. R.* 54.

It was earnestly urged, upon the argument, by the defendant's counsel, that if the complainant should be held to be entitled to recover the amount of the bonds, that the company will be compelled to pay almost double the amount they borrowed of Lewis, and that this would be a hard result, and one which a court of equity ought to prevent. But when property, which has been given in pledge for the payment of a debt or the performance of an agreement, is sold in default of the pledgee to perform his contract, it must often happen that it will be sold at what he considers a great sacrifice. This must be so in the very nature of things, and it is one of the risks which he incurred when he made the pledge. But if it was fairly sold he has no cause of complaint. Such sale must be maintained or the law of pledge must be abolished. Suppose, in the present case, that the purchase by the complainant had proved to be a bad one, and that he had given much more for the bonds than they were worth, and must be the loser to a large amount. He could not call on any one to refund to him ; he must abide by his contract, and bear whatever burthens it might impose. If, then, his purchase will prove a good one, shall he not also have its benefits ? There would be great injustice in laying down a rule which would compel a purchaser in such case to bear all the loss if he made a bad purchase, and to surrender all the advantages of it if it turned out to be a good one.

It is a circumstance worthy of consideration, and entitled to weight in this case, that the company, though fully apprised of the sale, took no measures to be represented there, and gave no notice whatever to the public or to the purchasers attending the sale that they had any claim upon the bonds, or any objection to their being sold. When notice of the intended sale was given to the company they took no steps to warn purchasers. They merely protested to Lewis against the sale, and informed him that they would hold him responsible. If they considered that they had a remedy

against him, and meant to rely upon that, it is still open to them. But why did they not notify *purchasers* of their claim ? They knew the nature of the bonds, that they were securities which in the usual course of business were considered and treated as negotiable, and which constantly passed from hand to hand as negotiable paper. The sale of such instruments, both in private and at public sale, was of frequent occurrence. There was nothing in the bonds themselves, nor in the fact or manner of their being sold, to warn purchasers that their title would be impeached or to put them on their guard against any claims on the bonds from any quarter whatever. It was reasonable that they should believe that whoever bought the bonds would be the owner of them by a complete and legal title. Under these circumstances is it just and equitable for the company now to come forward, and set up a claim upon them ? Ought they not rather to be considered as standing silently by, having a full knowledge of the sale, and acquiescing in the proceeding, at least so far as it concerned purchasers.

In every view which I have been able to take of the case, it seems to me clear that the complainant is the absolute owner of the bonds, and of the debt secured by them, free from all claim upon them on the part of the defendants.

It is further contended by the defendants, that even if the complainant is the owner of the bonds, yet that he is not entitled to the benefit of the mortgage security, because the mortgage was not assigned to him, and, being a chose in action, it cannot pass by delivery, but only by assignment in writing.

But it has been decided in this, as well as in other states, that a mortgage may pass by delivery without written assignment. *Hutchings* v. *Low*, 1 *Green* 246 ; *Allen* v. *Pancoast, Spencer* 68, and cases there cited.

It is also well settled that the debt secured by a mortgage is a principal thing—the mortgage is only an incident to the debt, and passes with the debt. *Martin* v. *Moulin*, 2 *Burr.* 978 ; *Green* v. *Hart*, 1 *Johns. C. R.* 580 ;

*Langdon* v. *Buel*, 9 *Wend.* 80 ; *Stevenson* v. *Black*, *Saxton* 313 ; *Bolles* v. *Wade et al.*, 3 *Green's C. R.* 460.

I am, therefore, of opinion that the complainant is entitled to the benefit of the mortgage to the extent of the bonds held by him ; that he is entitled to have the amount due upon them, with his costs to be taxed, raised and paid by sale or sequestration of the mortgaged property, and that it should be referred to a master to ascertain and report the amount, to the end that a final decree may be made. And I do respectfully advise the Chancellor that an interlocutory decree and order of reference should be made acccordingly.

J. WILSON, <em>M. C. C.</em>

February Term, 1854.


The opinion of the Court of Appeals was delivered by

ELMER, J. The complainant, Samuel F. Fisher, was shown to be the *bona fide* holder of six bonds of the Morris Canal and Banking Company, the defendants, and the question upon which the case on this appeal mainly turns, is, whether the honest acquisition of these securities, without notice of any defect in the title of the seller, if a defect there was, confers on him a title similar to that acquired by a *bona fide* holder of money, bills of exchange, and. promissory notes, payable to bearer. So far as we are aware, this is a case of the first impression, and it is certainly one of no little importance. Similar bonds have been issued, within a few years, by our numerous railroad and canal companies, to an immense amount, and are daily sold by the brokers and others, and passed from hand to hand by delivery, without any formal assignment, and without inquiry as to the title of the possessor.

The case has been elaborately and ably argued on both sides. On behalf of the appellants, it was insisted that these bonds being under seal, are in law specialities, and although in terms payable to bearer, if they are assignable by delivery only, it is by force of our statute, which leaves them

subject, in the hands of the assignee, to all the equities to which they were liable in the hands of the assignor. *Rev. Stat.* 801. That such is the law, in the case of ordinary bonds, cannot be questioned. By the common law, such bonds cannot be assigned so as to give a right of action to the assignee, although payable in terms to an assignee or bearer. *Glyn* v. *Baker*, 13 *East* 509 ; *Clark* v. *Farmers' Man. Co.*, 15 *Wend.* 256. Our statute, however, authorizes an assignment, whether the bond is or is not payable in terms to an assignee. *Sheppard* v. *Stites*, 2 *Hal.* 90. And such assignment, it has been held, may be by a delivery for a valuable consideration, without any writing. *Allen* v. *Pancoast, Spen.* 68. The mere insertion, therefore, of words making these bonds payable on their face to a bearer, is by no means decisive of the question now in dispute. Nor do we think it would necessarily follow that they would be subject to whatever equitable defence might be made against them in the hands of the assignor, if they were not legally assignable so that the assignee could sue on them in his own name. Smith, in his note to the case of *Miller* v. *Race, Smith L. C.* 363, seems to consider that such would be the result ; and no doubt the ability of the holder to sue in his own name, is essential to render an instrument negotiable, in the full sense of that expression. But courts of equity and courts of law protect the interest of a *bona fide* assignee. If, however, the assignee takes no legal, but only an equitable title, they protect also the equities existing at the time of the assignment between the maker of the instrument and the assignor. If the bonds in question are transferable by delivery, so as to confer a complete title in the possessor, it is not as instruments negotiable under the law of merchants, as bills and notes are, but as instruments of a peculiar character, expressly designed to be passed from hand to hand, and by a common usage known to all, actually so transferred. That they are, on their face, payable to bearer, is, of course, an important and perhaps indispensable circumstance to show that this was, in fact, their design, and that they are so used. But the usage itself, and in a case

like this, where the party issuing them is before the court denying the holder's title, the manner in which they were issued and used by the company itself, are the important facts which must have the principal influence in determining their true character. If, in point of fact, they are of such a character that a full title was intended to be conferred on any person who became the *bona fide* possessor of them, and this intention was not in contravention of the law, the original maker has no equity against the assignee. By the act of issuing a security, which, although in some respects like an ordinary bond, was, in its main characteristic of being designed to pass freely from hand to hand, and of being so held out to the world, essentially different, all such equities were designedly relinquished, and ought not to be regarded by courts of law or of equity.

That under ordinary circumstances, the property of bank notes and of bills and promissory notes payable on their face, or by a blank endorsement to a bearer, follows the possession, has been long settled. By analogy to this class of cases, the exigencies of business have from time to time introduced other securities into the same category. The Court of King's Bench seems to have hesitated to recognize India bonds as belonging to it. *Glyn* v. *Baker.* But parliament immediately interfered and declared them negotiable instruments. Exchequer bills were so regarded, in the case of *Wookey* v. *Pole,* 4 *Barn. and Ad.* 1. In the case of *Gorgier* v. *Mieville,* 3 *Bar. and Cress.* 45, bonds of the king of Prussia, which were shown to be ordinarily passed from hand to hand by delivery, and so designed, were held to be like money or bills, so as to give a *bona fide* possessor the legal title. And in the case of *Lang* v. *Smyth,* 7 *Bing.* 284, the same principle was applied to the case of instruments issued by the government of Naples, although in that case they were held not to be negotiable, because it was found that they did not usually circulate without a certificate, which did not accompany them. Parsons, in his recent work on contracts, vol. 1, page 240, expresses the opinion

that the common bonds of railroads fall within the reasoning and authority of these cases.

The manner in which these bonds are engraved, with coupons making the interest payable half-yearly to the bearer of them, and all the evidence before us conspire to show that the company which issued them, and which now disputes the title of the holder upon the ground that they put them into the hands of the seller for a special purpose, which did not authorize him to dispose of them as he did, really intended them to circulate, as in fact they do. This design is indeed quite as apparent as if it was engraved on their face in express words. The objection now made, that the legal character of the instrument adopted is such as to frustrate this design, certainly comes with a bad grace from the party which put them in circulation. Even as between third parties, we suppose the common usage to transfer them by delivery, without inquiry as to the title of the transferrer, would justify us in holding these securities to differ from common obligations, in being so far negotiable that the *bona fide* possessor shall be held to have a good title. But the case is still stronger against the party which made and issued them, with full knowledge of the prevailing usage, and with the manifest design that they should be so circulated. To permit such parties to dispute this result of the usage, would be to permit them to take advantage of their own wrong. And besides, the obvious interest of the companies is, that these bonds should be salable, free from all questions of equity. They are generally issued for the express purpose of raising money by their sale. To declare them subject to the equities existing in the case of ordinary bonds, upon every transfer of them, would be to strike a blow at the credit of the great mass of these securities now in the market, the consequences of which it would be impossible to predict.

We are, therefore, of opinion that the title of the present possessor of these bonds must be held to be complete. His right to proceed on the mortgage, in the manner adopted, follows as a necessary consequence. As to the objections

that the bonds were not issued for any purposes authorized by the stockholders and directors, and that they are illegal, fraudulent, and void, and that the bill of complaint is not properly drawn, it is only necessary to express our concurrence in the conclusions to which the master came, and in the reasoning upon which he founded them.

This view of the case renders it unnecessary to enter at large upon the investigation of the question so elaborately discussed by counsel, whether Mr. Lewis had a right to sell the bonds as he did. Some of the views taken by the master, in his very able opinion on this subject, seem questionable. If the bonds in dispute ought to be considered as placed in Lewis' hands by way of pledge, it is probably because they were securities usually sold in the stock market, and understood by the parties to be designed for that use, and not because a party's ordinary bond or mortgage, deposited as a collateral, could be so regarded. No case was produced where the debtor's own obligation, has been held to be a pledge for a debt due by simple contract. Nor do we think it clear that even a third party's bond or mortgage, deposited by way of a collateral, or as a pledge, can be sold by the pledgee, in default of payment, after notice to the pledger, unless a known usage or express agreement to do so is shown. But it is not intended to express any decided opinion on these questions. For the reasons assigned, the decree appealed from must be affirmed, each party to pay their own costs.

Decree affirmed unanimously.

CITED in Mor. Can. & Bkg. Co. v. Lewis, 1 Beas. 329; Winfield v. City of Hudson, 4 Dutch. 262; Freeman v. Freeman, 2 C. E. Gr. 47; Vreeland v. Van Horn, 2 C. E. Gr. 140; Morrow v. Inhabitants of Vernon, 6 Vr. 493.